# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| HTC CORPORATION, HTC AMERICA INC, | § § § | |
| | § | CIVIL ACTION NO. 6:18-CV-00243-JRG |
| *Plaintiffs*, | § § § | |
| v. | § § | |
| TELEFONAKTIEBOLAGET LM ERICSSON, ERICSSON INC, | § § § | |
| *Defendants*. | § § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Telefonaktiebolaget LM Ericsson and Ericsson, Inc.'s Motion to Sever, Stay, and Compel Arbitration of Plaintiff's "Past Refund" Claims Under Prior Licensing Agreements, (Dkt. No. 132), Motion to Sever and Stay HTC's Antitrust Claims and Request for Case Management Conference, (Dkt. No. 140), and Motion to Compel Arbitration or in the Alternative Dismiss HTC's Antitrust Claims Pursuant to Rule 12(b)(6). (Dkt. No. 155.) Having considered the motions and briefing, the Court is of the opinion that each motion should be and hereby is **GRANTED** for the reasons as set forth herein.

## I. BACKGROUND

### A. The Parties

Plaintiffs HTC Corporation ("HTC Corp.") and HTC America, Inc. ("HTC America") (collectively "HTC") design, manufacture, and sell smartphones. (Dkt. No. 135 ¶ 12.) HTC Corp. is a Taiwanese company with headquarters in Taiwan. (*Id.* ¶ 10.) HTC America is a wholly-owned subsidiary of HTC Corp. and has its principal place of business in Washington state. (*Id.*

¶¶ 10–11.)  HTC America sells HTC Corp.'s smartphones in the United States, which implement the second generation (2G), third generation (3G), and fourth generation (4G) Mobile Cellular and Wireless Standards.  (*Id.* ¶¶ 10–11, 51–52.)

Defendants Telefonaktiebolaget LM Ericsson ("TLM Ericsson") and Ericsson, Inc. (collectively "Ericsson") make and sell "base stations and supporting software and services compliant with the 2G, 3G, and 4G standards in the United States."  (Dkt. No. 156 ¶16.)  TLM Ericsson is a Swedish corporation with its principal place of business in Sweden, and its wholly-owned subsidiary, Ericsson, Inc., is a Delaware corporation with headquarters in Texas.  (*Id.* ¶¶14–15.)

### B.  Ericsson's Standard Essential Patents

"[T]he Internet, Wi-Fi, cellular networks, and the mobile devices on which we access these [] [function] in large part due to technological standards and innovation related to or made possible by these standards."  OSENGO, KRISTEN, PATENTS AND STANDARDS: PRACTICE, POLICY, AND ENFORCEMENT 1-2 (Michael L. Drapkin et al. eds., *Bloomberg Law* Book Division, 2018).  A standard is a uniform design for a product and is intended to represent the "best technological solution" to achieve a particular goal.  *Id.*  A key goal in telecommunications is interoperability.  Interoperability standards allow devices made by different manufacturers to connect with one another in a network environment.  *Id.* at 1-13.

Telecommunications standards are set by standards setting organizations ("SSOs") and/or standards-development organizations ("SDOs").  *Id.* at 1-3.  These include the European Telecommunications Standards Institute ("ETSI"), the 3rd Generation Partnership Project ("3GPP"), and the Institute of Electrical and Electronics Engineers ("IEEE").  *Id.* at 2-41.  Each of these organizations is comprised of hundreds of industry participants who, through consensus,

develop and adopt standards based on the latest technological innovations. *Id.* at 2-41–2-57. ETSI is one of seven member organizations of 3GPP that create standards related to mobile cellular technologies, including the 2G, 3G, and 4G standards. *Id.* IEEE, through its standard-setting association IEEE-SA, sets standards related to wired and wireless networks, such as wireless local area networks ("WLAN"). *Id.* "Once a standard is adopted, participants [in the respective SSO/SDO] begin to make investments tied to the implementation of the standard, such as creating compliant parts, building compliant cellular towers and even designing devices around particular capabilities." (Dkt. No. 135 ¶ 133.)

Patented technology that is "essential" to implement a standard is called a Standard Essential Patent ("SEP"). *See ETSI Rules of Procedure*, Annex 6, Clause 15. A patent is "essential" if it is not technically possible to practice the standard without infringing the patent. *Id.* SSOs/SDOs (e.g., ETSI, 3GPP, and IEEE-SA) have intellectual property rights ("IPR") policies that "define contractual terms for disclosure and licensing of patents that are essential for standard implementation." TAFFET, RICHARD & HARRIS, PHIL, PATENTS AND STANDARDS: PRACTICE, POLICY, AND ENFORCEMENT at 4-2 (Michael L. Drapkin et al. eds., *Bloomberg Law* Book Division, 2018). If a member owns a SEP, it is required to (1) formally declare the patent as essential to the standard and (2) agree to license its patent to companies that practice the standard on specific terms. *Id.* "A commitment to license creates a contract between the SEP owner and the SSO" in which "[s]tandards implementers are third-party beneficiaries under such contracts." *Id.* at 4-10. ETSI and 3GPP require SEP-holders to license patents on terms that are fair, reasonable, and non-discriminatory ("FRAND"). *See ETSI Rules of Procedure*, Annex 6, Clause 6. IEEE similarly requires members to license SEPs using a "reasonable rate," i.e., terms that are

reasonable and non-discriminatory ("RAND"). *See IEEE-SA Standards Board Bylaws*, Clause 6 (Dec. 2016).

Ericsson is a member of ETSI, 3GPP, and IEEE and has collaborated with industry members to develop cellular network and wireless communications standards. (Dkt. No. 156 ¶ 2.) Ericsson owns several patents that are essential to the 2G, 3G, 4G, and WLAN standards, (*Id.* ¶ 51), and has made a commitment to offer its SEPs on FRAND terms. (*Id.* ¶110.) The chipsets in HTC's smartphones implement the 2G, 3G, 4G, and WLAN standards, and as such, HTC is a third-party beneficiary of the contracts between Ericsson and the SSOs. (Dkt. No. 135 ¶¶ 48–50.) This means Ericsson is required to offer licenses to its SEPs to HTC on terms that comply with the IPR policies of ETSI, 3GPP, and IEEE.

### C. The Parties' Prior License Agreements

Ericsson licensed its SEPs to HTC in three prior agreements in 2003, 2008, and 2014. (Dkt. Nos. 132-2, 132–3, 132-4.) Each agreement contains an arbitration provision as provided below. (*Id.*)

2003 Agreement

10.    DISPUTES AND GOVERNING LAW

The validity, performance, construction and interpretation of this Agreement shall be governed by the laws of Sweden without regard to its conflict of law provision. All disputes, differences or questions between the Parties shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce in Stockholm, Sweden, by three (3) arbitrators, appointed in accordance with the said Rules. The arbitration proceedings shall be conducted in the English language.

The Parties undertakes and agrees [*sic*] that all arbitral proceedings conducted under this Article shall be kept confidential, and all information, documentation, materials in whatever form disclosed in the course of such arbitral proceeding shall be used solely for the purpose of those proceedings.

9.      DISPUTES AND GOVERNING LAW

The validity, performance, construction and interpretation of this Agreement shall be governed by the laws of Sweden without regard to its conflict of law provision. All disputes, differences or questions between the Parties shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce in Stockholm, Sweden, by three (3) arbitrators, appointed in accordance with the said Rules. The arbitration proceedings shall be conducted in the English language.

The Parties undertakes and agrees [*sic*] that all arbitral proceedings conducted under this Article shall be kept confidential, and all information, documentation, materials in whatever form disclosed in the course of such arbitral proceeding shall be used solely for the purpose of those proceedings.

2014 Agreement

**10      GOVERNING LAW AND DISPUTES**

10.1    The validity, performance, construction and interpretation of this Agreement shall be governed by the laws of the State of New York without regard to its conflict of law provisions.

10.2    All disputes, differences or questions arising out of or relating to the interpretation, performance, breach or termination of this Agreement, between the Parties shall be finally settled in New York, New York, under the Rules of Arbitration of the International Chamber of Commerce, by three (3) arbitrators, appointed in accordance with said Rules. The arbitration proceedings shall be conducted in the English language. The award shall be final and binding on the Parties and may be entered and enforced in any court having jurisdiction.

        The Parties undertake and agree that all arbitral proceedings conducted under this Article 10 as well as any decision or award that is made or declared during the proceedings shall be kept confidential, and all information, documentation, materials in whatever form disclosed in the course of such arbitral proceeding shall be used solely for the purpose of those proceedings.

10.3    Notwithstanding the aforesaid, nothing in this Article 10 shall prevent the Parties from seeking any interim or final injunctive or equitable relief by a court of competent jurisdiction.

10.4    Notwithstanding anything to the contrary, nothing herein shall be construed as restricting or limiting either Party or its Affiliates' or any of their direct or indirect distributor's or customer's ability to immediately assert a release, license, covenant or other defense in any litigation or other proceeding against such Party or its

Affiliates, or its or their products subject to the release, licenses, covenants or other rights under this Agreement, or the direct or indirect distributors or customers of such products, regardless of jurisdiction or venue.

Each of the prior licenses also references the Rules of Arbitration of the International Chamber of Commerce, which states in relevant part:

Effect of the Arbitration Agreement

1. Where the parties have agreed to submit to arbitration under the Rules, they shall be deemed to have submitted *ipso facto* to the Rules in effect on the date of commencement of the arbitration, unless they have agreed to submit to the Rules in effect on the date of their arbitration agreement.

2. By agreeing to arbitration under the Rules, the parties have accepted that the arbitration shall be administered by the Court.

3. If any party against which a claim has been made does not submit an Answer, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement or concerning whether all of the claims made in the arbitration may be determined together in a single arbitration, the arbitration shall proceed and any question of jurisdiction or of whether the claims may be determined together in that arbitration shall be decided directly by the arbitral tribunal, unless the Secretary General refers the matter to the Court for its decision pursuant to Article 6(4).

Arbitration Rules, INTERNATIONAL CHAMBER OF COMMERCE, Art. 6 (Mar. 1, 2017).

### D. The Instant Lawsuit

On April 6, 2017, HTC sued Ericsson in the Western District of Washington for breach of contract, breach of implied covenant of good faith and fair dealing, and promissory estoppel. (Dkt. No. 1.) HTC alleges that Ericsson failed to offer a license to its SEPs on FRAND terms. (*Id.*) HTC subsequently filed a first amended complaint ("FAC") on October 16, 2017, in which it dropped its claim for promissory estoppel and added a claim for back royalties that were allegedly non-FRAND (the "past refund" or "back royalty" claims). (Dkt. No. 41.) Ericsson subsequently moved to dismiss the FAC or transfer the case to this District. (Dkt. No. 46.) In addition to contesting personal jurisdiction and venue, Ericsson argued that HTC's back royalty claims are

subject to arbitration. (*Id.* at 15–18.) On May 17, 2018, the Western District of Washington held that it lacked personal jurisdiction over Ericsson and ordered the case be transferred to this District. (Dkt. No. 81.) The court also found that HTC's past refunds claims were not arbitrable:

> Defendants argue that the arbitration provisions in the Prior Licensing Agreements with Plaintiff mandate that this issue be arbitrated. The Court cannot agree, especially since Defendants expend the entire first portion of their briefing strenuously advocating that the Licensing Agreements—which arguably have a connection to this forum—are not the operative documents; that it is the contracts with the standards-setting agencies with which this litigation is concerned. It is not persuasive to do an about-face on the issue of subject matter jurisdiction and cite to those same Licensing Agreements for their arbitration provisions.

> The language of the complaint (which cites to the standards-setting contracts) controls— the arbitration provisions of the Licensing Agreements are inapplicable here and this portion of Defendants' motion will be DENIED.

(*Id.* at 4–5.)

After the case was transferred on June 1, 2018, (Dkt. No. 87), HTC filed a second amended complaint ("SAC") on August 17, 2018 to add antitrust claims under the Sherman Act. (Dkt. No. 135.) HTC alleges that Ericsson colluded with other large SEP holders to manipulate the standards-setting process "to obtain supracompetitive profits and avoid their FRAND obligation." (*Id.* ¶ 76.) These actions have allegedly "injured HTC, competition, customers, and consumers through decreased competition, increased prices, and reduced innovation, output choice, and quality" as well as "elevat[ed] [] royalties and product prices above competitive levels, the imposition on HTC of one-sided and onerous contract terms, [and] lost sales." (*Id.* ¶¶129, 135.) Since then, Ericsson has filed several motions to sever, stay, compel arbitration, and/or dismiss portions of HTC's SAC. (Dkt. Nos. 132, 140, 155.) On September 25, 2018, this Court heard oral argument on Ericsson's Motion to Sever and Stay HTC's Antitrust Claims and Request for Case Management Conference, (Dkt. No. 140), and took the matter under advisement. (Dkt. No. 185.)

### E. HTC's Arbitration Demand

On August 3, 2018, HTC filed a demand for arbitration against Ericsson with the International Chamber of Commerce. (Dkt. No. 132-7.) HTC asserts that the royalties it paid to Ericsson under the parties' 2003 and 2008 license agreements violated Swedish contract and European competition law. (*Id.* at 10.) As a remedy, HTC requests, among other things, repayment for royalties paid "that have been contrary to FRAND terms and conditions." (*Id.* at 13.)

## II. DISCUSSION

Ericsson moves to sever, stay, and compel arbitration of (1) HTC's claim for back royalties and (2) HTC's antitrust claims. Ericsson also moves, in the alternative, to dismiss HTC's antitrust claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

### A. HTC's Claim for Back Royalties

Ericsson argues that HTC's claims for back royalties must be submitted to arbitration because they are covered by arbitration clauses in the parties' 2003, 2008, and 2014 license agreements. HTC contends that Ericsson is procedurally barred from seeking arbitration, and that even if it is not, the claims are not arbitrable. The Court will first address HTC's procedural arguments before turning to its substantive arguments.

#### i. The Law of the Case Doctrine

HTC first argues that Ericsson's motion to compel arbitration should be denied under the law of the case doctrine. "[T]he doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) (internal citation omitted); *Bayou Steel Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh,*

*Pennsylvania*, 487 Fed. Appx. 933, 936 (5th Cir. 2012); *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1423 (5th Cir. 1995). This rule applies to decisions made by (1) the same court; (2) a coordinate court of equal rank in the same case; and (3) an appeals court that remands the case to the district court. *Christianson*, 486 U.S. at 816; *Bayou Steel*, 487 Fed. Appx. at 936.

While a court on remand must obey the decisions of the appeals court (known as the "mandate rule"), a court has discretion to revisit its own decisions or those of a coordinate court of equal rank. *Christianson*, 486 U.S. at 818 ("[T]he law-of-the-case doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'"); *Copeland*, 47 F.3d at 1424 ("[T]he law of the case doctrine is a discretionary rule of practice which does not limit the power of the court to revisit a legal issue."); *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) ("[A]n issue of ... law decided on appeal may not be reexamined by the district court on remand or by the appellate court on a subsequent appeal.") (internal citations omitted). Reconsideration of a prior decision is appropriate when "the prior ruling was erroneous, is no longer sound, or would work an injustice." *Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983); *Christianson*, 486 U.S. at 818 (holding that a court should not revisit a prior decision "absent extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice'") (internal citation omitted); *see, e.g.*, *United States v. Boruff*, 909 F.2d 111, 116 (5th Cir. 1990) (finding doctrine did not apply where new facts developed). As such, the doctrine "is not [] a barrier to correction of judicial error." *Loumar*, 698 F.2d at 762.

HTC argues that prior to transfer, Judge Pechman in the Western District of Washington ruled that its past refund claims were non-arbitrable, and therefore, under the law of the case doctrine, this Court should honor that ruling. (Dkt. No. 151 at 2.) HTC argues that reconsideration

is not appropriate because: (1) HTC's claims have not changed; (2) there has been no intervening change of law; and (3) it would reward Ericsson's attempt to "obtain[] improper reconsideration only after the case was transferred." (*Id.* at 2, 8–9; Dkt. No. 175 at 2–3.)

Ericsson disagrees and argues that reconsideration is proper because new facts have developed that establish that arbitration is required. (Dkt. No. 132 at 13.) HTC previously represented to Judge Pechman that its back royalty claims were not premised on the prior licenses, but instead on Ericsson's alleged breach of its FRAND obligation. (*Id.*) As such, HTC argued that its claims did not implicate the arbitration provisions in the prior license agreements. (*Id.*) Ericsson argues that "this Court [now] has . . . information about HTC's claims that the Washington Court did not have—specifically, HTC's FRAND contentions that reveal that interpretation and performance of the Prior Licenses will be at issue, and HTC's recent filing of an arbitration seeking the same 'back royalties' relief." (*Id.*) Ericsson states that "[c]ourts routinely evaluate how theories of liability evolve in a case, and are willing to reconsider an earlier denial of arbitration if evolution of the case warrants." (*Id.*) Ericsson also believes reconsideration is appropriate because the Washington Court: (1) found that it lacked personal jurisdiction, and so was not a "court of competent jurisdiction" for purposes of the law of the case doctrine and (2) did not apply this Circuit's "wholly groundless" standard for arbitration agreements. (*Id.* at 12–14.)[1]

Having considered the arguments, the Court finds that it is not bound by Judge Pechman's ruling and further finds that reconsideration in this instance is appropriate. As Ericsson points out, HTC describes the prior licenses and royalties paid under those agreements in its responsive FRAND contentions. (Dkt. No. 132-6 at 5–9.) In fact, HTC states that Ericsson's June 14, 2018

---

[1] The parties allege that the arbitration provisions in the prior license agreements delegate the question of arbitrability to the arbitrator. In such instances, the Fifth Circuit sends this threshold inquiry to arbitration unless the assertion of arbitrability is "wholly groundless."

contentions "entirely avoid[ed] discussion of Ericsson's excessive past license rates, which are also at issue in this litigation." (*Id.* at 10.) In addition, HTC filed a demand for arbitration against Ericsson in August 2018, seeking "pursuant to Swedish contract law, . . . repayment by Ericsson of the sums otherwise overpaid by HTC pursuant to the [2003 and 2008 license agreements] in respect of royalties that have been contrary to FRAND terms and conditions." (Dkt. No. 132-7 at 13.) The Court finds that these new developments justify revisiting the prior ruling by the Washington court.

### ii. Waiver

HTC also argues that Ericsson has waived its right to arbitration. "[A] party waives its right to arbitrate if it (1) substantially invokes the judicial process and (2) thereby causes detriment or prejudice to the other party." *Janvey v. Alguire*, 847 F.3d 231, 243 (5th Cir. 2017) (internal citation omitted). This analysis is highly fact-dependent, in which any doubts should result in a finding of no waiver. *Al-Rushaid v. Nat'l Oilwell Varco, Inc.*, 757 F.3d 416, 421–22 (5th Cir. 2014) ("[I]n light of the federal policy favoring arbitration, '[t]here is a strong presumption against finding a waiver of arbitration.'") (internal citation omitted). As such, the party asserting waiver "bears a heavy burden of proof." *Petroleum Pipe Americas Corp. v. Jindal Saw, Ltd.*, 575 F.3d 476, 480 (5th Cir. 2009) (internal citation omitted).

"A party substantially invokes the judicial process when it 'engage[s] in some overt act in court that evinces a desire to resolve the arbitration dispute through litigation.'" *Vine v. PLS Fin. Servs., Inc.*, 689 Fed. Appx. 800, 804 (5th Cir. 2017) (internal citation omitted); *see also Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 329 (5th Cir. 1999) (a waiving party "implement[s] or enforc[es] the judicial process" as to the arbitrable claims and "must do more than call upon unrelated litigation to delay an arbitration processing"). This may include a number of pre-trial

activities, such as moving to dismiss, filing an answer and counterclaims, and participating in discovery. *See, e.g.*, *Janvey*, 847 F.3d at 244 n.11(waiver found where party "moved to dismiss, filed an initial answer and amended answer, sent written discovery, and answered discovery" over the span of three years before moving to compel arbitration); *Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 345 (5th Cir. 2004) (waiver found where party "answered . . . counterclaims; conducted full-fledged discovery, including four depositions; amended its complaint; . . . filed the required pretrial materials with the district" as well as "two motions to compel discovery, a motion for summary judgment, and a motion *in limine*" all before its motion to compel arbitration); *but see Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 578 (5th Cir. 1991) (no waiver where party "did not ask the court to make any judicial decision, for example, by requesting summary judgment" and the "district court actions . . . mainly were routine scheduling order and discovery continuances"); *Tenneco Resins, Inc. v. Davy Intern. AG*, 770 F.2d 416, 421 (5th Cir. 1985) (no waiver where party indicated desire to arbitrate in answer and engaged in minimal discovery).  At the very least, a party that seeks a decision on the merits has substantially invoked the judicial process.  *Petroleum Pipe*, 575 F.3d at 480 (internal citation omitted).

Prejudice refers to the "delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate the same issue." *Petroleum Pipe*, 575 F.3d at 480 (internal citations omitted).  Relevant factors include, but are not limited to, "(1) whether discovery occurred relating to arbitrable claims; (2) the time and expense incurred in defending a motion for summary judgment; and (3) a party's failure to timely assert its right to arbitrate." *Id.*  Whether prejudice has occurred is a matter of degree.  For example, delay in seeking arbitration, without more, will generally not constitute prejudice.  *Nicholas v. KBR, Inc.*, 565 F.3d 904, 910 (5th Cir. 2009) (internal citation omitted).  However, when delay is coupled

with "pretrial activity inconsistent with an intent to arbitrate, the party later opposing a motion to compel arbitration may more easily show that its position has been compromised, i.e., prejudiced." *Id*. Similarly, engaging in discovery before seeking arbitration will not result in automatic prejudice. It will depend on the extent and nature of the discovery and whether it encompassed the arbitrable claims. *Janvey*, 847 F.3d at 244 ("Parties cannot enjoy the benefits of federal discovery, and then, after doing so, seek to enforce a decision through private resolution."); *Tenneco*, 770 F.2d at 421 ("However, when only a minimal amount of discovery has been conducted, which may also be useful for the purpose of arbitration, the court should not ordinarily infer waiver based upon prejudice. . . .").

Whether a party has waived arbitration is generally a question for the court and is sent to the arbitrator only if the parties "clear[ly] and unmistakabl[y] evidence" an intent for such result. *Vine*, 689 Fed. Appx. At 803. This usually requires an "explicit[] mention [of] litigation-conduct waiver" in the agreement. *Id.* at 804 (refusing to interpret silence regarding waiver issue in favor of sending to the arbitrator).

HTC argues that Ericsson waived its right to arbitrate the past refund claims. HTC asserts that Ericsson substantially invoked the judicial process by: (1) "request[ing] that the Western District of Washington dismiss or transfer this case, rather than . . . simply . . . compel arbitration;" (2) "fil[ing] counterclaims based on the same third-party FRAND obligations, [but] never arguing that its own third-party claims were subject to arbitration;" (3) "agree[ing] to a scheduling order in this District;" (4) engaging in expansive discovery "without mentioning the possibility of a forthcoming arbitration motion;" and (5) waiting months to seek arbitration and reconsideration of Judge Pechman's decision. (Dkt. No. 151 at 4–6.) HTC explains that it has produced "over 188,000 pages of discovery" to date and "has incurred hundreds of thousands of dollars in fees" in

the process.  (*Id.* at 5–6.)  Moreover, "Ericsson's discovery requests do not relate exclusively or even primarily to either arbitrability of the claims at issue or to non-arbitrable issues" and would be unavailable to Ericsson in an arbitration proceeding.  (Dkt. No. 175 at 2; Dkt. No. 151 at 5–6.) HTC argues that it would be unfair to send the claims to arbitration knowing that Ericsson has had the benefit of discovery to which it would have not obtained otherwise.  (*Id.*)

Ericsson asserts that it has not waived any rights.  Ericsson argues that it filed a motion to dismiss the arbitrable claims and that its counterclaims were "limited to the parties' current license negotiations" and thus "not subject to mandatory arbitration."  (Dkt. No. 165 at 2.)  Ericsson also contests that its participation in discovery supports waiver, explaining that its requests have applied to both arbitrable and non-arbitrable claims.  (*Id.*)  Ericsson further maintains that HTC has suffered no prejudice given that: (1) its "discovery requests largely relate to the parties' current FRAND dispute, which is not subject to mandatory arbitration;" (2) it "has not filed any motions for summary judgment;" and (3) it "timely asserted its right to arbitration."  (*Id.* at 2–3.)  With respect to any purported delay, Ericsson explains that it waited to file this motion based on HTC's stated plan to file for arbitration under the prior licenses.  (*Id.* at 3.)  "Only when HTC filed for arbitration approximately one month later did Ericsson realize that HTC was not replacing its past refund claims in district court with claims in arbitration," but was instead seeking relief in both forums.  (*Id.*)  HTC responds that it "never indicated [to Ericsson] that its arbitration claims based on the Licenses were meant to replace [its] third-party beneficiary claims in this suit."  (Dkt. No. 175 at 1.)

The Court finds that Ericsson did not waive its right to arbitrate the past refund claims. Waiver of an arbitration right is strongly disfavored and "should not be lightly inferred," *Janvey*, 847 F.3d at 243, especially where, as here, the defendant has timely asserted its right to arbitration.

*See Tenneco*, 770 F.2d at 420 ("Thus, once the defendant, by answer, has given notice of insisting on arbitration the burden is heavy on the party seeking to prove waiver.") (internal citation omitted). After HTC added claims for past royalties in October 2017, (Dkt. No. 41), Ericsson promptly moved to dismiss those claims as subject to arbitration. (Dkt. No. 46.) That motion remained pending until May 2018 when the Washington Court ruled that the claims were non-arbitrable and transferred the case to this District. (Dkt. No. 81.) After the case was transferred in June 2018, Ericsson explains that HTC planned to file for arbitration under the prior licenses. For example, HTC stated in another motion that "[t]hrough European counsel, HTC intends to assert . . . claims in arbitration in accordance with the past license agreements." (Dkt. No. 105 at 8 n.6.) However, once Ericsson realized that HTC was pursuing claims for past refunds in both arbitration and in court, it immediately filed the instant motion. Ericsson's delay in seeking arbitration, therefore, was entirely reasonable given HTC's conduct. HTC contends that it never told Ericsson that it would drop the past refund claims in court. However, the Court was not presented with any communications regarding the same. Even if HTC's general statement that it planned to file for arbitration could be interpreted as having no effect on its intent to litigate its past refund claims here, this Court must resolve all doubts in favor of Ericsson in light of the strong presumption against waiver. Accordingly, the Court is not persuaded that Ericsson "substantially invoked the judicial process" with an intent to litigate, rather than arbitrate, HTC's past refund claims.

Going further, even if the Court agreed that Ericsson's participation in discovery amounted to waiver, HTC has not shown material prejudice. HTC explains that it has incurred tremendous expense on discovery, the majority of which would be unavailable to Ericsson in an arbitration proceeding. The majority of discovery that HTC identifies, however, occurred when Ericsson's

initial motion to dismiss was pending before the previous court. (Dkt. No. 151-2 at 2–4.) Prejudice refers to the harm incurred to a party "when the party's opponent forces it to litigate an issue and *later* seeks to arbitrate the same issue." *Petroleum Pipe*, 575 F.3d at 480 (emphasis added). Such is not the case here. Once HTC added its past refund claims, Ericsson immediately moved for arbitration. It would be unfair to infer prejudice based on discovery conducted during the pendency of Ericsson's motion to dismiss. *See Rab of Louisiana Inc. v. Louisiana-Pac. Corp.*, No. 5:08-cv-49, 2009 WL 10676990, at *1 (E.D. Tex. Mar. 17, 2009) ("Because LP has already requested arbitration in this case, this Court finds that it may engage in discovery in this case without waiving its right to arbitrate."). HTC also identifies a single interrogatory that Ericsson propounded after the case was transferred but before it filed the instant motion. (Dkt. No. 151-2 at 4.) Minimal discovery, even that which covers arbitrable claims, is generally not sufficient to find prejudice. *Tenneco*, 770 F.2d at 421; *see, e.g.*, *Walker*, 938 F.2d at 578 (finding no waiver where defendant served interrogatories and document requests, did not request a decision on the merits, and the court engaged in routine scheduling prior to defendant requesting arbitration). For the reasons set forth herein, HTC's waiver arguments are unavailing.

### iii. Enforcing the Arbitration Agreement

Having concluded that Ericsson is not procedurally barred from seeking arbitration, the Court now addresses whether HTC's claims for back royalties are, in fact, arbitrable.

Enforcement of an arbitration agreement involves a two-step analysis. First, the court must decide whether the parties entered into an arbitration agreement. *Archer and White Sales, Inc. v. Henry Schein, Inc.*, 878 F.3d 488, 492 (5th Cir. 2017), *cert. granted*, 138 S. Ct. 2678 (2018) (internal citations omitted). This is a question of contract formation and concerns whether the parties agreed to arbitrate some set of claims. *Id.* (internal citation omitted); *Rent-A-Car, West,*

*Inc. v. Jackson*, 561 U.S. 63, 71–72 (2010) (holding that court must assess validity and/or enforceability of an arbitration provision only if that specific provision is challenged, and not another provision of the contract or the contract as a whole). If there is an arbitration agreement, the court must then decide whether the claim is covered by the agreement and should therefore be submitted to arbitration. *Archer*, 878 F.3d at 492 (internal citation omitted). The court applies ordinary state contract law, in which "any doubts concerning the scope of arbitrable issues [are] resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

This analysis changes when the agreement purportedly delegates the question of arbitrability to the arbitrator. In those cases, the presumption in favor of arbitration is reversed and "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 890 U.S. 938, 945 (1995) (internal citations omitted) (noting that since parties may not appreciate the significance of having an arbitrator decide the scope of his own authority, a presumption in favor of arbitration "might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide").

The Fifth Circuit has adopted a specific framework for applying this rule. If the court determines that the parties "clearly and unmistakably" intended to delegate arbitrability to an arbitrator, the court must send this threshold inquiry to arbitration unless the assertion of arbitrability is "wholly groundless." *Archer*, 878 F.2d at 495; *Douglas v. Regions Bank*, 757 F.3d 460, 462–64 (5th Cir. 2014) (adopting test set forth in *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006)).[2] An assertion is "wholly groundless" if there is no plausible argument for

_____
[2] The Supreme Court recently granted a petition for writ of certiorari to decide whether a court must nonetheless submit the question of arbitrability to the arbitrator *even if* it finds the assertion of arbitrability "wholly groundless."

the arbitrability of the dispute. *Archer*, 878 F.2d at 495 (internal citations omitted). The Fifth

Circuit has cautioned that this exception is a "narrow one" and courts should be careful not to

"prejudge arbitrability disputes more properly left to the arbitrator pursuant to a valid delegation

clause." *Id.* (internal citation omitted); *see generally AT&T Tech., Inc. v. Commc'n Workers of

*Am.*, 475 U.S. 643, 659 (1986) ("[I]n deciding whether the parties have agreed to submit a

particular grievance to arbitration, a court is not to rule on the potential merits of the underlying

claims."). If "there is a legitimate argument that the arbitration clause covers the present dispute,

and, on the other hand, that it does not," then "the resolution of those plausible arguments [should

be left to] the arbitrator." *Douglas*, 757 F.3d at 463 (internal citations omitted).

Turning to the licenses at issue, the Court first notes that each contains an arbitration clause

that expressly incorporates by reference the Rules of Arbitration of the International Chamber of

Commerce ("ICC Arbitration Rules"). (Dkt. Nos. 132-2, 132–3, 132-4.)

2003 Agreement

10.    DISPUTES AND GOVERNING LAW

 . . . . All disputes, differences or questions between the Parties shall be finally settled under
the Rules of Arbitration of the International Chamber of Commerce in Stockholm, Sweden,
by three (3) arbitrators, appointed in accordance with the said Rules. . .

2008 Agreement

9.    DISPUTES AND GOVERNING LAW

 . . . All disputes, differences or questions between the Parties shall be finally settled under
the Rules of Arbitration of the International Chamber of Commerce in Stockholm, Sweden,
by three (3) arbitrators, appointed in accordance with the said Rules. . .

---

*Archer and White Sales, Inc. v. Henry Schein, Inc.*, 878 F.3d 488, 492 (5th Cir. 2017), *cert. granted*, 138 S. Ct. 2678
(2018) (internal citations omitted).

2014 Agreement

**10.     GOVERNING LAW AND DISPUTES**

. . . 10.2      All disputes, differences or questions arising out of or relating to the interpretation, performance, breach or termination of this Agreement, between the Parties shall be finally settled in New York, New York, under the Rules of Arbitration of the International Chamber of Commerce, by three (3) arbitrators, appointed in accordance with said Rules. . .

Article 6 of the ICC Arbitration Rules provides that "any question of jurisdiction or of whether the claims may be determined together in that arbitration *shall be decided directly by the arbitral tribunal*, unless the Secretary General refers the matter to the Court for its decision pursuant to Article 6(4)."  Arbitration Rules, INTERNATIONAL CHAMBER OF COMMERCE, Art. 6 (Mar. 1, 2017) (emphasis added).  The Fifth Circuit has held that express adoption of rules that delegate this threshold inquiry to the arbitrator demonstrates clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.  *See Cooper v. WestEnd Capital Mgmt., LLC*, 832 F.3d 534, 546 (5th Cir. 2016) (holding that express adoption of JAMS Rules, which delegated arbitrability to arbitrator, "presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability"); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (concluding that express adoption of AAA arbitration rules showed parties' intent to arbitrate arbitrability).  Accordingly, the Court finds that the parties' 2003, 2008, and 2014 license agreements delegate the issue of arbitrability to the arbitrator.  The only remaining inquiry then is whether Ericsson's assertion of arbitrability is "wholly groundless."

HTC alleges that it has "incurred substantial monetary damage by being forced to pay non-FRAND royalties to Ericsson over the course of the parties' long relationship" and as a result, it is entitled to back royalties.  (Dkt. No. 135 ¶ 119.)  Ericsson argues that to prove this, HTC will need to analyze and interpret the prior licenses.  To support this contention, Ericsson (1) lists ten

potential "arbitrable disputes, issues, or questions related to the interpretation and performance of the Prior Licenses," including "[t]he actual percentage royalty rate that HTC paid in view of the Prior Licenses' royalty caps" and "[w]hether HTC's course of dealing and performance under the Prior Licenses waives and/or supersedes its new position," and (2) explains that HTC's arbitration demand "asserts that the royalties in the 2003 and 2008 licenses violate Ericsson's FRAND commitment to ETSI," which is the same relief sought in this case. (Dkt. No. 132 at 8–11.)

HTC responds that while it is seeking the same relief in both arbitration and court, "the causes of action are separate" and the "reference [to] the SSOs [in the arbitration demand] does not speak to or in any way influence the non-arbitrability of [its] separate third-party beneficiary claims." (Dkt. No. 151 at 11.) The claims in arbitration are brought under Swedish contract and European competition law whereas its claims in this case are brought pursuant to Ericsson's FRAND obligations. (*Id.*) HTC contends that since the licenses are governed by Swedish and New York law, "[t]hese changes in venue and the law to be applied could not be possible if each arbitration clause went beyond the agreement of which it is a part to cover other times, claims, and laws, such as HTC's third party beneficiary claims, which are under French law and extend over time periods of all the Licenses." (*Id.* at 12–13.) HTC also argues that each of Ericsson's ten potential arbitrable issues are "strawmen" and can be resolved without reference to the license agreements. (*Id.* at 14–15; Dkt. No. 175 at 4–5.)

The Court disagrees. HTC claims that its past royalty payments to Ericsson were non-FRAND and demands a refund of any excess payments. The 2003 and 2008 licenses require arbitration of "[a]ll disputes, differences or questions between the Parties," (Dkt. No. 132-2 at 9; Dkt. No. 132-3 at 9), and the 2014 license requires arbitration of "[a]ll disputes, differences or questions arising out of or relating to the interpretation, performance, breach or termination of this

Agreement." (Dkt. No. 132-4 at 19.) Whether HTC is owed a refund and the amount thereof is certainly a "dispute[], difference[] or question[] between the Parties." Since the terms of the royalties are set out in each of the prior license agreements, resolving this "dispute[], difference[] or question[]" will necessarily require a review of those agreements and thus at a minimum "aris[es] out of or relat[es] to the[ir] interpretation [and/or] performance." HTC's argument that the licenses' choice of law provisions limit arbitrable claims to those brought under Swedish and New York law, respectively, is simply nonsensical. A choice of law provision is generally understood to designate the law of a particular jurisdiction that must be applied to disputes arising out of or relating to the contract. It does not represent the types of claims the parties agreed to arbitrate. HTC does not explain why an opposite interpretation is warranted aside from identifying the applicable choice of law provisions. The Court finds that Ericsson has presented a plausible argument that the refund claims are covered by the arbitration clauses, and as such, its assertion of arbitrability is not "wholly groundless." The threshold question of whether the past refund claims are arbitrable must be sent to the arbitrator pursuant to the parties' delegation clause. *Douglas*, 757 F.3d at 463 (holding that if "there is a legitimate argument that the arbitration clause covers the present dispute, and, on the other hand, that it does not, then "the resolution of those plausible arguments [should be left to] the arbitrator").

### iv. Severance and Stay

If a case includes arbitrable and non-arbitrable claims, the court must sever and stay the arbitrable claims pending resolution of the arbitration. 9 U.S.C. § 3; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985); *Wick v. Atlantic Marine*, 605 F.2d 166, 158 (5th Cir. 1979) ("[I]t is well settled in this circuit that if some claims are arbitrable and others are not and they are easily severable, that the court should stay proceedings as to those claims which are arbitrable.").

HTC argues, however, that its past refund claims cannot be severed from its other breach of FRAND claims because they "are derived from single causes of action and involve the same facts and issues." (Dkt. No. 151 at 8.) Specifically, HTC asserts that this case is about "a single pre-suit breach of contract, one that continued for years during and at the end of the various Licenses, and that is included in a single claim." (Dkt. No. 175 at 5.)[3] While that may be true, a court must submit to arbitration only those claims to which the parties agreed to arbitrate, "even if the result is piecemeal litigation" or "the possibly inefficient maintenance of separate proceedings in different forums." *Byrd*, 470 at 217, 221 (internal citations and quotation marks omitted).[4] "The preeminent concern of Congress in passing the [Arbitration] Act was to enforce private agreements. . . and that concern requires that [courts] rigorously enforce agreements to arbitrate." *Id.* at 221. As a result, the Court concludes that it has no discretion in this context and must sever and stay HTC's request for past refunds pending resolution of the arbitration.

## B. HTC's Antitrust Claims

On August 17, 2018, HTC added claims alleging that Ericsson violated Sections 1 and 2 of the Sherman Act. Ericsson moves to sever, stay, and compel arbitration of HTC's antitrust claims, or in the alternative, to dismiss those claims under Federal Rule of Civil Procedure 12(b)(6).

### i. Enforcing the Arbitration Agreement

Ericsson argues that HTC's antitrust claims are subject to arbitration under the prior license agreements. Ericsson explains that HTC alleges that it has purportedly paid higher royalties for

---

[3] HTC cites *In re Garza*, 90 F. App'x 730, 735 (5th Cir. 2004) for the proposition that "[t]he Fifth Circuit recognized that 'severance of a single cause of action into two parts is never proper and should not be granted." (Dkt. No. 151 at 8.) That case applied Texas state law and did not concern severing arbitrable claims from non-arbitrable claims and is therefore distinguishable.

[4] The Supreme Court has expressly rejected the "doctrine of intertwining," which gave courts discretion to deny arbitration if the arbitrable and non-arbitrable claims arose "out of the same transaction" and were "sufficiently intertwined factually and legally." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 216 (1985).

Ericsson's SEPs as a result of Ericsson's anticompetitive conduct in coordination with other large SEP-holders, and seeks a refund for past royalties paid. (Dkt. No. 155 at 8–9.) Ericsson argues that any alleged overpayment occurred because HTC entered into the prior licenses, which include arbitration clauses. Ericsson concludes, therefore, that "HTC's antitrust claims arise out of performance of the Prior licenses—i.e., HTC's payments to Ericsson." (*Id.* at 9.) Ericsson also argues that HTC's arbitration demand for past royalties "demonstrates that its antitrust claims are arbitrable" and that "HTC has never explained how its district court and arbitration claims are not duplicative, much less how [it can bring] European competition law claims [in arbitration] but not [its] U.S. competition law claims." (*Id.* at 10.)

HTC responds that the antitrust claims are "broader than and not implicated by" the license agreements. (Dkt. No. 183 at 3.) HTC substantially sets forth the same flawed arguments that it did for the past refund claims and argues that the choice of law provisions in the arbitration agreements (which are limited to Swedish and New York law, respectively) limit the types of claims subject to arbitration (which it argues does not include U.S. antitrust law). (*Id.* at 3–5.)

As with the past refund claims, the Court finds that Ericsson's assertion that HTC's antitrust claims are arbitrable is not "wholly groundless" and thus this threshold inquiry should be sent to the arbitrator. HTC alleges that it "has made quarterly royalty payments of millions of dollars to Ericsson," that those "payments were improperly and unlawfully extracted by Ericsson in breach of its FRAND licensing obligations," and that "Ericsson's conduct [was] made possible by collaborative action" that violates U.S. antitrust law. (Dkt. No. 135 at ¶¶ 175–76.) HTC has allegedly suffered "the imposition of . . . one-sided and onerous contract terms" as a result, and seeks relief in the form of back royalties. (*Id.* ¶ 135, H.) For the same reasons as the past refund claims, it is difficult to envision how HTC could prove it is entitled to back royalties without

examining the terms of the prior licenses and the parties' performances thereunder. At a minimum, the Court finds that it is at least plausible that the antitrust allegations implicate the arbitration provisions in the prior license agreements and therefore holds that the issue of arbitrability should be submitted to arbitration.

### ii. Severance and Stay

Since the arbitrability of HTC's antitrust claims must be sent to arbitration, those claims must be severed and stayed pending resolution of arbitration. *See supra* Section II.A.iv.

### iii. Federal Rule of Civil Procedure 12(b)(6)

Having determined that HTC's antitrust claims are arbitrable and should be severed and stayed pending resolution of arbitration, Ericsson's request in the alternative to dismiss the claims under Federal Rule of Civil Procedure 12(b)(6) is considered by the Court to be moot.

## III. CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** Ericsson's Motion to Sever, Stay, and Compel Arbitration of Plaintiff's "Past Refund" Claims Under Prior Licensing Agreements, (Dkt. No. 132), Motion to Sever and Stay HTC's Antitrust Claims and Request for Case Management Conference, (Dkt. No. 140), and Motion to Compel Arbitration or in the Alternative Dismiss HTC's Antitrust Claims Pursuant to Rule 12(b)(6). (Dkt. No. 155.)

It is therefore **ORDERED** that HTC's request for back royalties pursuant to Count I and HTC's antitrust allegations pursuant to Counts III and IV of the Second Amended Complaint, (Dkt. No. 135) (the "Severed Claims") are hereby **SEVERED** and shall be submitted to arbitration for a determination of their arbitrability. It is further **ORDERED** that the Severed Claims, as a new and distinct case in this Court's docket, are **STAYED** pending resolution of the arbitration.

**So ORDERED and SIGNED this 7th day of November, 2018.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE